**BERRY LAW PLLC**
745 Fifth Avenue, 5th Floor
New York, New York 10151
Phone: (212) 355-0777
Eric W. Berry
berrylawpllc@gmail.com

**TARTER KRINSKY & DROGIN LLP**
1350 Broadway, 11th Floor
New York, New York 10018
(212) 216-8000
Michael Z. Brownstein, Esq.
mbrownstein@tarterkrinsky.com

*Attorneys for Shalom Maidenbaum,*
  *a Creditor*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
POUGHKEEPSIE DIVISION

---------------------------------------------------X

*In re* AARON FISCHMAN, LLC,

                         Debtor,

---------------------------------------------------X

SHALOM S. MAIDENBAUM,

                         Plaintiff,

    - against -

AARON FISCHMAN,

                         Defendant.

---------------------------------------------------X

Chapter 11

Case No.  23-36038 (CGM)

Adversary Proceeding No. 24-

**COMPLAINT PURSUANT TO**
**11 U.S.C. §§523 and 727**

        Plaintiff Shalom S. Maidenbaum, by his undersigned attorneys, for his Complaint in this

adversary proceeding, alleges as follows:

## I.  PARTIES

1.  Plaintiff Shalom S. Maidenbaum ("Maidenbaum") is a resident of the State of New York, Nassau County.   As of the filing date of this petition, Fischman owed Maidenbaum $5,689,875. Thereafter, Maidenbaum collected 9 million NIS in an Israeli proceeding against Fischman.  Based on exchange rates then in effect, a total of $2,425,000 was collected in Israel, and the amount that Fischman owes Maidenbaum is $3,264,875.

2.  Defendant Aaron Fischman ("Fischman") is a resident of the State of New York, Sullivan County.  Fischman is a debtor in a Chapter 11 case before this Court entitled *In re Aaron Fischman*, Case No.  23-36038-CGM (Bankr., S.D.N.Y).

## II.  NATURE OF THIS ADVERSARY PROCEEDING

3.  Fischman's bankruptcy case was filed on December 19, 2023.

4.  This complaint includes both:

(a) Claims to determine the dischargeability of Fischman's debts to Maidenbaum pursuant to 11 U.S.C. §523(a).  *See* 11 U.S.C. §1141(d)(2) ("A discharge under . . . [C]hapter [11] does not discharge a debtor who is an individual from any debt excepted from discharge under section 523 of this title.")

- and -

(b) Objections to discharge under 11 U.S.C. §727(a).  *See* 11 U.S.C. §1141(d)(3)(C) (confirmation of a plan does not discharge a debtor if "the debtor would be denied a discharge under section 727(a)[.]")

## III.  JURISDICTION and VENUE

5.   This adversary proceeding is brought in a Chapter 11 case pending in the United

States Bankruptcy Court for the Southern District of New York, Poughkeepsie Division.  *In re Aaron Fischman*, Case No.  23-36038-CGM (Bankr., S.D.N.Y).

6.  This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §1334.

7.   This is a core proceeding under 28 U.S.C. §157.

8.  Venue in this District is proper under 28 U.S.C. §1409.

## IV.  FACTS RELEVANT TO ALL CLAIMS

**(A)   Background**

**(i) Cardis**

9.  Fischman's debts to Maidenbaum arise principally out of a scheme in which Fischman promoted investments in, and raised funding for, related companies known as Cardis Enterprises International, N.V., Cardis Enterprises International, B.V., and Cardis Enterprises International (U.S.A.), Inc.  (collectively, "Cardis").   The Cardis companies operated as a single entity and had consolidated finances.

10.  Fischman had sole and unilateral control over Cardis, and routinely signed documents as the "president," the "chief executive officer" and /or a "director" of the Cardis entities.

11.  According to Fischman's representations to investors and lenders, Cardis owned valuable but undeveloped credit card and payment processing intellectual property.[1]  Fischman

---

[1]Fischman told Maidenbaum and other investors that, when developed, Cardis' intellectual property would allow "aggregation" of small amount payments made with credit or debit cards.  One purpose of the technology was to enable a merchant with an aggregator account to easily set up payment processing capabilities by sharing a merchant account with other businesses, instead of setting up a separate merchant account.

further claimed to prospective lenders and investors that, with sufficient funding, Cardis intended to, and was capable of, monetizing that technology. From time to time, Fischman represented that Cardis intended to undertake an initial public offering when the technology development reached the appropriate stage, and that there was a high likelihood that the securities sold to Cardis' investors would become valuable and easy to monetize as part of, or following, that offering.

12. Fischman represented to prospective lenders and investors that, because Cardis was a foreign corporation that did not have a bank account in the United States, the funding it received would be deposited into the escrow account of a lawyer named Lawrence Katz.

13. Fischman raised in excess of $70 million in funding for Cardis which was received into Katz's IOLA account. Little if any of that money was used for developing Cardis' technology. Instead, the money was diverted to Fischman and his wife, Nina, who spent the bulk of it on an extravagant lifestyle and, apparently, hid the rest in overseas accounts.

### (ii) Fischman's Securities Fraud Conviction and the AG's Civil Suit Against Him

14. In 2018, the New York Attorney General filed a civil action against Fischman and Katz (among others) arising from fraudulent sales of Cardis securities to investors. *People by Letitia James v. Fischman, et al.*, Index No. 452353/2018. The civil action alleges that Fischman and Katz participated in a scheme that diverted tens of millions of dollars in funding provided by Cardis' investors from their disclosed and proper uses and misappropriated and converted those funds.

15. The New York Attorney General also conducted a criminal investigation of Fischman and Cardis. In 2020, the Attorney General indicted Fischman on charges that paralleled those in its civil action. On December 15, 2022, Fischman pled guilty to a felony violation of General Business

4

Law §352-c(5), a state securities fraud statute, disgorged $1 million to the Attorney General and agreed to disgorge another $1 million within three years. In his allocution, Fischman specifically admitted to intentionally defrauding Cardis investors.

16. In the Attorney General's civil action, on August 3, 2023, Justice Robert Reed denied all motions to dismiss, including one by Katz. Justice Reed's decision states, *inter alia*, "that . . . the amended complaint explains how Katz and several of his affiliates, through their control of Cardis bank accounts, assisted defendant Fischman in siphoning over $3 million in investor payments through fraudulent payments to Choshen." The decision recognized that the AG's amended complaint "details how Katz and several affiliated defendants assisted in fraudulent payments to Fischman family members and charities, none of whom had any right to the money[.]" The decision recognized that "the amended complaint describes how [] Katz and his affiliates allegedly misappropriated Cardis' money to fund defendant Katz's own personal expenses and [traces] in detail defendants' alleged theft of Cardis funds[.]" The decision also recounts the Attorney General's allegations tracing how over $200,000 in Cardis investor funds were misappropriated by Katz.

**(iii) <u>The funding that Maidenbaum provided to Cardis</u>**

17. Maidenbaum provided funding for Cardis, in the form of equity investments, loans and direct payments to third-parties on Cardis' behalf. Maidenbaum made $900,000 in equity investments in Cardis and received certificated securities representing a portion, but not all of his $900,000 of his equity investments in Cardis.[2] Maidenbaum's equity investments were all based on

---

[2] In connection with his equity investments, Maidenbaum received certificates of stock in Cardis dated January 4, 2007 (120,500,000 shares); December 31, 2009 (220,000,000 shares); and February 24, 2010 (220,000,000 shares).

Fischman's representations that Cardis would use the capital contributions to develop, and continue to develop, payment processing and credit card technology. At all relevant times, Fischman actually intended to misappropriate, and then did misappropriate to himself, his families and certain charities, the entirety of Maidenbaum's equity investments.

**(C) The Debts Based on the Funding that Maidenbaum**
**Provided to Cardis, Including Loans Guaranteed by Fischman**

**(i) Fischman's $4,314,611.07 Debt to Maidenbaum**

18. Maidenbaum's Proof of Claim lists a judgment debt in the amount of $4,314,611.07 ("the $4,314,611.07 debt") owed by Fischman. *In re Aaron Fischman*, Case No. 23-36038-cgm, Claim 8-1, pg 4 of 145.

19. The $4,314,611.07 debt arises from 17 advances that Maidenbaum made to Cardis between June 18, 2009 and September 16, 2013, for total of $1,350,000. These were the first loans that Maidenbaum made to Cardis, and like Maidenbaum's earlier equity investments, were induced by Fischman's representations that Cardis would use the money to develop, and continue to develoop, the payment and credit card processing technology it owned

20. As of February 23, 2015, no part of the $1,350,000 was repaid. That day, Fischman, on behalf of Cardis, and Maidenbaum reached a novation (substitute agreement) concerning the $1,350,000 loan. As documented in a promissory note that Fischman signed on behalf of Cardis on February 23, 2015, under the new terms, Cardis would pay the amount of $2,000,000 (*i.e.*, the $1,350,000 principal amount plus only a portion of the then-outstanding interest on that amount) on or before April 30, 2015, together with eight percent (8%) interest on the $2 million amount calculated from February 23, 2015. In the promissory note, Fischman also personally guaranteed the

debt on behalf of Cardis. Also, on February 23, 2015, Fischman confessed judgment on behalf of both himself and Cardis of the principal amount of $2 million together with unpaid interest and expenses.

21. Neither Cardis nor Fischman (as guarantor) repaid the $2 million note and on June 21, 2016 Maidenbaum filed a confession of judgment in the amount of $2,576,442.78 (which was inclusive of the $2 million principal, together with interest and costs). *Maidenbaum v. Fischman*, Supreme Court, Nassau Co., Index No. 604610/2016. Post-judgment interest on that amount as of the filing of Fischman's bankruptcy petition was $1,738,168.29. *In re Aaron Fischman*, Case No. 23-36038-cgm, Claim 8-1, pg 4 of 145.

**(ii) Fischman's $594,793.79 Debt to Maidenbaum**

22. Maidenbaum's Proof of Claim also lists a judgment debt in the amount of $594,793.79 ("the $594,793.79 Debt") owed by Fischman. *In re Aaron Fischman*, Case No. 23-36038-cgm, Claim 8-1, pgs 4-5 of 139.

23. The $594,793.79 Debt arises from three separate additional loans that Maidenbaum provided to Cardis between October 7, 2014 and February 23, 2015, that totaled $275,000. As documented in a promissory note that Fischman signed on behalf of Cardis on February 23, 2015, Cardis agreed to repay the $275,000 amount by May 31, 2015, together with eight percent (8%) interest on the $275,000 amount calculated from February 23, 2015. In the promissory note, Fischman also personally guaranteed the debt on behalf of Cardis. Also, on February 23, 2015, Fischman confessed judgment in the principal amount of $275,000, together with unpaid interest and expenses.

24.    Neither Cardis nor Fischman (as guarantor) repaid the $275,000 note and Maidenbaum

filed a confession of judgment in the amount of $355,542.98, which was inclusive of the $275,000

principal, interest and costs, on June 28, 2016.    *Maidenbaum v. Fischman*, Supreme Court, Nassau

Co., Index No. 604766/2016.    Post-judgment interest which has accrued as of the filing of

Fischman's bankruptcy petition was $239,250.81.    *In re Aaron Fischman*, Case No. 23-36038-cgm,

Claim 8-1, pg 5 of 145.

**(D)  The Debts Based upon Maidenbaum's**
**        Personal Loans to Fischman            **

    **(i) Fischman's $477,617.02 Debt to Maidenbaum**

25.    Maidenbaum's Proof of Claim also lists a judgment debt in the amount of $477,617.02

("the $477,617.02 Debt") owed by Fischman.    *In re Aaron Fischman*, Case No. 23-36038-cgm,

Claim 8-1, pg 5 of 145.    On May 4, 2015, Maidenbaum made a personal loan to Fischman in the

amount of  $250,000 pursuant to a promissory that Fischman signed that same day.  The promissory

note required that the loan be repaid by July 31, 2015.    Fischman also executed a confession of

judgment in the $250,000 amount together with interest and costs.  The loan was not repaid and

Maidenbaum filed judgment against Fischman in the amount of $285,500.17, which was inclusive of

pre-judgment interest and costs. *Maidenbaum v. Fischman*, Supreme Court, Nassau Co., Index No.

604767/2016.  No part of the judgment has been paid and, as of the filing date of Fischman's petition,

post-judgment interest was $182,892.34.    *In re Aaron Fischman*, Case No. 23-36038-cgm,  Claim

8-1, pg 5 of 145.

    **(ii) Fischman's $95,447.95 Debt to Maidenbaum**

26.     Maidenbaum's Proof of Claim also lists a judgment debt in the amount of $95,447.95.

("the $95,447.95 Debt") owed by Fischman.  *In re Aaron Fischman*, Case No. 23-36038-cgm,  Claim

8-1, pg 5 of 145.   On May 4, 2015, Maidenbaum agreed to make a personal loan to  Fischman in

the amount of $50,000 pursuant to a promissory note that Fischman signed that same day.   The

promissory note required that the loan be repaid by July 31, 2015.   Fischman also executed a

confession of judgment in the $50,000 amount together with interest and costs.  The loan was not

repaid and Maidenbaum filed judgment against Fischman in the amount of $57,054.85, which was

inclusive of pre-judgment interest and costs.  *Maidenbaum v. Fischman*, Supreme Court, Nassau Co.,

Index No. 604768/2016.  No part of the judgment has been paid and, as of the filing date of

Fischman's petition, post-judgment interest was $38,393.10.  *In re Aaron Fischman*, Case No.

23-36038-cgm, Claim 8-1, pg 5 of 145.

**(E) Fischman's $204,936.15 Debt to Maidenbaum**

27.     Maidenbaum's Proof of Claim also lists a judgment debt in the amount of $204,936.15

("the $204,936.15 Debt") owed by Fischman.  This debt was established in an Israel proceeding

between Maidenbaum and Fischman, in which Maidenbaum was awarded declaratory relief

recognizing that Fischman had fraudulently conveyed an apartment in Jerusalem to his wife, Nina.

*Maidenbaum v.  Fischman*, Civil Claim 56273-04-19 (Jerusalem District Court, Sept. 2, 2022).

Maidenbaum was also award ILS 75,000, the equivalent to $22,234.70, in legal fees, and ILS

562,409.5, the equivalent of $163,204.00, in disbursements (for a total of .$185,438.70, prior to

applicable interest).

28.    The Israeli proceeding was under a statute, Section 34(b) of the Execution Law,

5727-1967, which is similar to New York statutes governing actual fraudulent transfers, *i.e.*, former

DCL provision §276, and §273(a)(1) of the amended statute (which implements the Uniform Voidable Transfers Act). The $185,438.70 award is analogous to one under former DCL §276-a (awarding fees to a plaintiff in a successful actual fraudulent conveyance case).

29. Maidenbaum's declaratory judgment under Section 34(b) of the Execution Law, 5727-1967 was based on findings that Fischman caused false statements to be made in Israeli public real estate records that Nina, rather than Fischman himself, was the actual owner of an apartment in Jerusalem.[3]

30. Maidenbaum's declaratory judgment under Section 34(b) of the Execution Law, 5727-1967 was also based on findings that Fischman caused the apartment to be titled in Nina's name because he intended to harm his creditors.

31. A transfer that violates Section 34(b) of the Execution Law, 5727-1967 (or former DCL provision §276 or §273(a)(1) of the amended New York statute) because it was based on "false pretenses, false representation[s], or actual fraud" is non-dischargeable under 11 U.S.C. § 523(a)(2)(A), and one that was intended to frustrate the rights of a judgment creditor is non-dischargeable under 11 U.S.C. §523(a)(6). For the same reasons, the award of fees and expenses incurred in establishing the actual fraudulent transfer is non-dischargeable. *In re Kovler*, 249 B.R. 238, 260-263 (Bankr., S.D.N.Y. 2000)

---

[3]The apartment was sold at public auction in July 2023, after bank of Jerusalem foreclosed on it. As noted herein, Maidenbaum collected 9 million NIS (or $2,425,00) out of the auction proceeds in partial satisfaction of his New York judgments, which were filed in Israel, after prevailing in the Israeli fraudulent transfer action.

32.     No part of the judgment has been paid and, as of the filing date of Fischman's petition,

applicable  interest was $19,492.45,for a total debt due from Fischman to Maidenbaum in the amount

of $204,936.15 .  *In re Aaron Fischman*, Case No. 23-36038-cgm, Claim 8-1, pgs 5-6 of 145.

## V.  CLAIMS FOR RELIEF

### First Claim:

### Declaratory Judgment That the
### $4,314,611.07 Debt Is Nondischargeable
### Pursuant to 11 U.S.C. §523(a)(2)

33.   Paragraphs 1 - 32 are repeated and realleged as if set forth fully herein.

34.   11 U.S.C. §523(a)(2) excepts from discharge any debt for money, property,

services, or an extension, renewal, or refinancing of credit, to the extent obtained by false

pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or

an insider's financial condition.

35.   Fischman's $4,314,611.07 debt to Maidenbaum arose from money that Fischman

advanced to Cardis based on Fischman's false pretenses and actual fraud.

36.   Fischman defrauded Maidenbaum by inducing him to advance $1,350,000 to Cardis

between June 18, 2009 and September 16, 2014.  Maidenbaum made 17 separate advances, totaling

$1,350,000, on the following dates and in the following amounts:

      June 18, 2009 - $50,000
      July 31, 2009 - $50,000
      September 3, 2009 - $200,000
      September 21, 2009 - $50,000
      December 23, 2009 - $50,000
      October 21, 2010 - $100,000
      October 21, 2010 - $150,000
      December 8, 2010 - $125,000
      December 31, 2010 - $65,000

February 28, 2011 - $50,000
March 9, 2011 - $10,000
March 22, 2011 - $50,000
March 22, 2011 - $25,000.00
April 1, 2011 - $50,000.00
August 29, 2013 - $150,000.00
August 29, 2013 - $100,000.00
September 16, 2013 - $100,000.00

37. Maidenbaum advanced each of these 17 loans installments based on Fischman's express representations that: (a) the work of developing and continuing to develop Cardis' credit card and payment processing technologies was underway; (b) the loans Fischman and Cardis were seeking from Maidenbaum would be used solely to fund the development of Cardis' credit card and payment processing technologies and pay legitimate business expenses; (c) the funds Fischman and Cardis were seeking from Maidenbaum were necessary to ensure the completion of Cardis' efforts at developing and monetizing Cardis' technology and (d) that the money would be repaid.

38. Each of the foregoing statements by Fischman was false and materially misleading when made. As Fischman well knew, there were actually no serious ongoing efforts at Cardis aimed at developing the technology, and the funds that Fischman solicited Maidenbaum to invest were diverted from Cardis and any legitimate uses to Fischman and his wife, Nina, and used to support their extravagant lifestyle. Fischman induced Maidenbaum's loans without any intention of having the money used for legitimate purposes and with every intention of diverting it to himself and his wife Nina.

39. New York law recognizes that a statement of present intention is a statement of a material existing fact and sufficient to support a fraud action. A claim based on a misrepresentation of present intention is nondischargeable under §523(a)(2)A) if the misrepresentation relates to the uses to which

the debtor would put the money. When a debtor is entrusted with money to use for a specific purpose and the debtor has no intention of using it in that manner, a misrepresentation exists upon which a debt can be held nondischargeable. Proof that the debtor did not put the money toward the promised purpose allows a court to infer the requisite intent.

40. When the $1,350,000 in loan installments were novated (reduced to a new agreement) on February 23, 2015, Fischman expressly promised and guaranteed in writing that, if Cardis could not repay the $2 million principal and interest dues under the promissory note, that Fischman would do so. Fischman issued that written guaranty at a time when he had no intention of honoring it.

41. The checks provided by Maidenbaum and intended as loans to Cardis were deposited in two separate IOLA accounts in the name of an attorney, Lawrence Katz. Katz and his IOLA accounts were entirely subject to Fischman's dominion and control. On November 12, 2020, Fischman testified at a hearing in *Maidenbaum v. Fischman*, Nassau Co. Index No. 601538/2016, that "for over 20 years" he "directed" what Katz did with the money that Katz received into his IOLA accounts on behalf of Cardis.

42. Between September 7, 2007 and May 2016, Katz caused at least $3,861,080 to be transferred from his IOLA account to an account in the name of Nina Fischman, Aaron's wife. (Forensic reports credited by an Israel court in a dispute between Maidenbaum and Fischman concluded that the amount was $4,090,080 and that, by February 7, 2020, the amount transferred from Katz's IOLA account to Nina rose to almost $5 million.) Nina was never employed by Cardis and did not draw any salary or other compensation from Cardis. In a February 22, 2023 affirmation by Fischman's attorney, Levi Huebner, Esq. filed in *Maidenbaum v. Nina Fischman*, Sup. Ct., Nassau Co., Index No. 601538/2021, Huebner admitted on Fischman's behalf that between September 7,

2007 and May 2016, at least $3,861,080 was paid from Katz's IOLA account to Nina Fischman's bank account.

43.     Fischman had no intention of causing Cardis, which he controlled, to repay Maidenbaum's loans. According to the amended complaint in the Attorney General's civil action,  no later than January 2011, Fischman, with the assistance of Katz, began to siphon off huge sums of investor monies to enrich Fischman, Fischman's family members and various charities.   According to the Attorney General, from January 2011 to November 2015,  Fischman received at least $3 million that was funneled through a shell company, Choshen Israel, LLC to support Fischman's life style.   At minimum, from January 2011 forward, Fischman induced Maidenbaum to advance the loan installments underlying the $4,314,611.07 debt without any intention of repaying them or causing Cardis to repay them.

44.     Fischman was under a duty to disclose—but failed to disclose—to Maidenbaum that no technology development work was actually underway at Cardis when he solicited Maidenbaum's loans.  Fischman was also under a duty to disclose—but failed to disclose—that the funds that Maidenbaum loaned to Cardis would be, and were, diverted to the personal uses of Fischman and his family.  These omissions were motivated by Fischman's intention to induce Maidenbaum to make the loans underlying the $4,314,611.07 debt.

45.     Fischman's promises that Cardis would repay the loans from Maidenbaum underlying the $4,314,611.07 debt were false and false statements of present intention when made.

46.     Fischman promised that Cardis would repay the loans underlying the $4,314,611.07 debt in order to deceive Maidenbaum.

47.     The foregoing misrepresentations and omissions by Fischman were material.

48. Maidenbaum reasonably relied on Fischman's representations that Cardis would repay the loans.

49. Maidenbaum was damaged in his business and property as the proximate result of Fischman's misrpresenations that Cardis would repay the loans.

50. The foregoing misrepresentations and omissions by Fischman were the proximate cause of damages that Maidenbaum suffered.

51. For the foregoing reasons, Maidenbaum is entitled to an order determining that the $$4,314,611.07 debt (*In re Aaron Fischman*, Case No. 23-36038-cgm, Claim 8-1, pg 4 of 145) is nondischargeable under 11 U.S.C. §523(a)(2).

**Second Claim:**

**Declaratory Judgment That the**
**$594,793.79  Debt Is Nondischargeable**
**Pursuant to 11 U.S.C. §523(a)(2)**

52. Paragraphs 1 - 51 are repeated and realleged as if set forth fully herein.

53. Fischman's $594,793.79 debt to Maidenbaum arose from money that Maidenbaum advanced to Cardis based on Fischman's false pretenses and actual fraud.

54. Fischman defrauded Maidenbaum by inducing him to advance $275,000 to Cardis between October 7, 2014 and February 23, 2015.  Maidenbaum advanced the $275,000 in three separate installments on the following dates and in the following amounts:

October 7, 2014 - $100,000
November 7, 2014 - $100,000
February 23, 2015 - $75,000

55. Maidenbaum advanced each of these three installments based on Fischman's express representations that:  (a) Cardis had formed a joint venture with a company called Epoint Payment

Corp. ("Epoint") that would take over the work of developing the credit card and payment processing technology; (b) that an experienced technology executive named David Crockett would be involved in joint efforts by Epoint and Cardis to develop the technology; (c) the money that Maidenbaum was lending would be contributed by Cardis to the venture with Epoint and used in the joint efforts to develop the technology; and (d) if Cardis could not pay the money back, then Fischman would, as stated in Fischman's guaranty which was included in the promissory note.

56.     Each of the foregoing representations were false when made.  In fact, Fischman did not intend to, and did not, forward the funding from Maidenbaum to the claimed joint development project involving Epoint and Crockett. Instead, Fischman simply misappropriated the $275,000 and used it for his own purposes.

57.     Each of the foregoing statements by Fischman was false and materially misleading when it was made.  As Fischman well knew, there were actually no serious ongoing efforts by either Cardis or Epoint aimed at developing the technology, and the funds that Maidenbaum loaned would be, and were, diverted to from Cardis to Fischman and his wife, Nina, and used to support their extravagant lifestyle.  Fischman induced Maidenbaum's loans without any intention of having the money used for legitimate purposes and with every intention of diverting it to himself and his wife Nina.

58.     The $275,000 provided by Maidenbaum and intended as loans to Cardis were deposited in Katz's IOLA accounts.   As Fischman admits, Katz was entirely subject to Fischman's dominion and control.   As Fischman's attorney Levi Huebner has admitted, between September 7, 2007 and May 2016, Katz caused at least $3,861,080 to be transferred from his IOLA account to a bank account in the name of Nina Fischman, even though Nina was never employed by Cardis and did not draw any salary or other compensation from Cardis.

59. Fischman had no intention of causing Cardis, which he controlled to repay Maidenbaum's loans. According to the Attorney General's Amended Complaint in its civil action, beginning no later than 2011, Fischman and Katz began to siphon off large amounts of funds that had been provided by Maidenbaum and other victims of Fischman's scheme in order to enrich Fischman, his family members, and various charities. From that point forward, Fischman's unvarying intention was to misappropriate money that had been obtained on behalf of Cardis to his own control, and use it to support his extravagant lifestyle. From January 2011, Fischman's conscious intention was solely to enrich himself by means of converting and misappropriating investments and advances that were intended to be used to develop Cardis' technology.

60. Fischman was under a duty to disclose—but failed to disclose—to Maidenbaum that no technology development work was actually underway at Cardis when he solicited Maidenbaum's loans. Fischman was also under a duty to disclose—but failed to disclose—that the funds that Maidenbaum loaned to Cardis was diverted to the personal uses of Fischman and his family. These omissions were motivated by Fischman's intention to induce Fischman to make the loans underlying the $594,793.79 debt.

61. Fischman's promises that Cardis would repay the loans from Maidenbaum underlying the $594,793.79 debt were false and false statements of present intention when they were made.

62. Fischman promised that Cardis would repay the loans from Maidenbaum underlying the $594,793.79 debt in order to deceive Maidenbaum.

63. Maidenbaum reasonably relied on Fischman's representations that Cardis would repay the loans.

64. Maidenbaum reasonably relied on Fischman's guaranty that, if Cardis did not repay the loans, that Fischman would personally do so.

65. The foregoing misrepresentations and omissions by Fischman were material.

66. Maidenbaum was damaged in his business and property of Fischman's misrepresentations that the loans underlying the $594,793.79 debt would be repaid.

67. The foregoing misrepresentation and omissions by Fischman were the proximate cause of the damages Maidenbaum suffered.

68. For the foregoing reasons, Maidenbaum is entitled to an order determining that the $594,793.79 debt (*In re Aaron Fischman*, Case No. 23-36038-cgm, Claim 8-1, pg 4 of 145) is nondischargeable under 11 U.S.C. §523(a)(2).

### Third Claim:

### Declaratory Judgment That the $4,314,611.07 And $594,793.79 Debts Are Nondischargeable Pursuant to 11 U.S.C. §523(a)(4)

69. Paragraphs 1 - 68 are repeated and realleged as if set forth fully herein.

70. 11 U.S.C. §523(a)(4) provides: "A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt . . . for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."

71. Under 11 U.S.C. §523(a)(4), a creditor must establish an "express trust" that the debtor violated.

72. Fischman owed creditors of Cardis fiduciary duties at the time Maidenbaum advanced the 17 loan installments underlying the $4,314,611.07 debt and the three loans installments underlying the $594,793.79 debt. Specifically, an "express trust" arose pursuant to the "trust fund doctrine" prior

to the time Maidenbaum advanced the loan installments underlying these two debts. since at those times Cardis was either insolvent or in the zone of insolvency.

73.  Under New York law, the "trust fund doctrine" imposes trust obligations on the officers and directors of a corporation that is insolvent or in the zone of insolvency and imposes liability upon corporate officers and directors for wrongly dissipating assets of such corporations.

74.  Cardis's insolvency at the time Fischman solicited the loans underlying the $4,314,611.07 debt and the $594,793.79 debt is established since:

(a)  Financial statements for Cardis for 2009 disclose $809.898 in assets and $10,934,823 in liabilities.

(b)  Audited financial statements for Cardis for 2011disclose $699,932 in assets and $7,930,500 in liabilities.

(c)  Audited financial statements for Cardis for 2012 disclose $173,457 in assets and $7,727,391 in liabilities.

(d)  A Cardis "capitalization table" showed that Cardis had convertible debt in the amount of $11,197,463 and non-convertible debt in the amount of $3,207,672 as of December 31, 2015.

(e)  A January 12, 2016 email exchange between Stephen Brown, who functioned as a Cardis officer, and an individual named Gerald Brounstein confirms that a correct capitalization table could not be prepared for Cardis because, as Brounstein stated, "no financials were prepared for the last couple of years."

- and -

(f) A June 27, 2016 email from Brown to an individual named Graham Jack states that after 2012 Cardis' Financial statements were not reviewed by outside auditors since "we were in the middle of the accountant's review for 2013, when the accounting firm (BDO) stopped their audit because [we] were behind in paying them."

75. The case law within the Second Circuit recognizes that because the fiduciary duty owed by the officers of an insolvent corporation to creditors under New York law pursuant to the "trust fund doctrine" arises at the time of insolvency and prior to wrongdoing, it satisfies the requirement of a "fiduciary capacity" under the discharge exception for debts obtained by fiduciary fraud or defalcation set forth in 11 U.S.C. §523(a)(4).

76. The case law within the Second Circuit recognizes that the trust fund doctrine implicates an express trust and satisfies that element of §11 U.S.C. §523(a)(4).

77. New York law recognizes that corporate officers and directors owe the fiduciary duty of loyalty to existing equity investors in the corporation and that the fiduciary duty of loyalty prohibits self-dealing and waste by the officer or director.

78. The use of Katz's IOLA accounts to divert the loans underlying the $4,314,611.07 debt and the $594,793.79 debt from their intended use (*i.e.,* funding efforts by Cardis to monetize its credit card and payment processing technologies) to the personal use of Fischman and his family establishes a violation of an express trust. The stated purpose of the express trust created by Katz' IOLA account was to bank funds received from investors and lenders, including Maidenbaum, so that Cardis could draw upon the funds as needed for proper development efforts. The subject of the trust was funding intended for Cardis' use that was provided by Maidenbaum and other individuals. Fischman, by

means of his admitted domination and control of Katz's IOLA account, caused the violation of the express trust arising from the use of Katz's IOLA accounts.

79. Fischman owed fiduciary duties to Maidenbaum at the time of Maidenbaum's loans underlying the $4,314,611.07 debt and the .$594,793.79 debt since, at the time Maidenbaum made these loans, Fischman was an officer of Cardis, in which Maidenbaum was an equity investor.

80. Fischman violated the express trust implicated by the trust fund doctrine and arising from the use of Katz's IOLA accounts, as well has his fiduciary duties to Maidenbaum, when he fraudulently induced Maidenbaum to make the loans underlying the $4,314,611.07 debt and the $594,793.79 debt by means of the false and misleading representations and omissions, as set forth in ¶¶33-68, *supra*.

81. Fischman violated the express trust implicated by the trust fund doctrine and arising from the use of Katz's IOLA accounts when he engaged in defalcation by misappropriating to himself the funds that Maidenbaum provided to Cardis pursuant to the loans underlying the $4,314,611.07 debt and the $594,793.793,306.20 debt. In doing so, Fischman violated his legal duties to both Cardis and Maidenbaum, as set forth in ¶¶33-68, *supra*.

82. Fischman committed larceny by inducing Maidenbaum to make the loans underlying the $4,314,611.07 debt and the $594,793.79 debt since there was no intention to repay those loans. Fischman did so with the intention of converting that money to his own possession and control, as set forth in ¶¶33-68, *supra*.

83. Fischman committed embezzlement of the funds that Maidenbaum loaned to Cardis by means of the loans underlying the $4,314,611.07 debt and the $594,793.79 debt when Fischman intentionally converted that money to his own possession and control, and used it for his and his

family's own purposes, rather than that the uses for which Maidenbaum intended it, as set forth in ¶¶33-68., *supra*.

84. For the foregoing reasons, Fischman's acts of breach of fiduciary duty, larceny and embezzlement, warrant a declaration pursuant to 11 U.S.C. §523(a)(4) that the $4,314,611.07 debt and the $594,793.79 debts are non-dischargeable.

**Fourth Claim:**

**Declaratory Judgment That the $477,617.02 Debt Is
Nondischargeable Pursuant to 11 U.S.C. §523(a)(2)**

85. Paragraphs 1 - 84 are repeated and realleged as if set forth fully herein.

86. Fischman's $477,617.02 debt to Maidenbaum is evidenced by a May 4, 2015 promissory note in the principal amount of $250,000. The promissory note states that Fischman:

> . . . is currently involved in a $5 Million raise for an entity to be formed with FIS Global Payment Systems. Upon the earlier of the raising of the first $600,000.00 of said raise or June 15, 2015, time being of the essence, Payor shall pay $75,000.00. Thereafter, upon the earlier of the funding of $2 Million to Cardis Enterprises International or its affiliates or July 31, 2015,time being of the essence, Payor shall pay the balance of the loan together with any and all accrued interest.

87. Maidenbaum reasonably relied on the foregoing written representation in deciding to advance the $250,000 to Fischman.

88. Each of the foregoing written statements by Fischman was false, a false statement of present intention, and materially misleading when it was made. Fischman knew at the time he signed the promissory note, there was no possibility of a near term $5 Million "raise" that would benefit either Fischman or Cardis or involve FIS Global Payment Systems, nor was Fischman personally involved in efforts to bring about that type of transaction.

89. Similarly, as Fischman well knew at the time he signed the May 4, 2 015 promissory note, there was also no prospect of Cardis obtaining $2 Million in funding in the near term.

90. At the time Fischman signed the May 4, 2015 promissory note, he had no intention of repaying Maidenbaum's $250,000 loan.

91. Fischman had far greater knowledge than Maidenbaum of Cardis' relationship with FIS Global Payment Systems, and any ongoing efforts (or the lack of genuine ongoing efforts) by FIS Global Payment Systems and/or Cardis to raise money as of the May 4, 2015 execution date. Fischman's superior knowledge imposed on him an obligation to disclose all relevant information concerning those matters when soliciting the $250,000 loan from Maidenbaum. Despite Fischman's duty of full disclosure, he failed to inform Maidenbaum that no serious or substantial fund raising efforts were underway—either through or apart from FIS Global Payments Systems—that could benefit either Cardis or Fischman.

92. Fischman's written representations and omissions that induced Maidenbaum to make the $250,000 loan pursuant to the May 4, 2015 promissory note were false and misleading.

93. Maidenbaum reasonably relied on Fischman's written representations when he agreed to loan $250,000 to Fischman.

94. The foregoing misrepresentations and omissions by Fischman were the proximate cause of damages that Maidenbaum suffered.

95. For the foregoing reasons, Maidenbaum is entitled to an order determining that the $477,617.02 debt (*In re Aaron Fischman*, Case No. 23-36038-cgm, Claim 8-1, pg 5 of 145) is nondischargeable under 11 U.S.C. §523(a)(2).

**Fifth Claim:**

**Declaratory Judgment That the $204,936.15 Debt Is Non-dischargeable
Pursuant to 11 U.S.C. §523(a)(2 and §523(a)(6)**

96.     Paragraphs 1 - 95 are repeated and realleged as if set forth fully herein.

97.     Maidenbaum's declaratory judgment in Israel under Section 34(b) of the Execution

Law, 5727-1967 was based on findings that Fischman caused false statements to be made in Israeli

public real estate records that Nina, rather than Fischman himself, was the actual owner of an

apartment in Jerusalem.[4]  Since the Israeli judgment is based on "false pretenses, false

representation[s], [and] actual fraud," Maidenbaum's Israeli judgment against Fischman is non-

dischargeable under 11 U.S.C. § 523(a)(2)(A).

98.     Maidenbaum's declaratory judgment under Section 34(b) of the Execution Law,

5727-1967 was also based on findings that Fischman caused the apartment to be titled in Nina's name

because he intended to harm his creditors. Under 11 U.S.C. §523(a)(6) a claim is non-dischargeable if

it seeks to redress "willful and malicious injury to another entity or to the property of another entity."

99.     For the same reasons, the award of fees and expenses incurred in establishing the actual

fraudulent transfer is likewise non-dischargeable.  *In re Kovler*, 249 B.R. 238, 260-263 (Bankr.,

S.D.N.Y. 2000)

**Sixth Claim**

**Objection to the Discharge of  Fischman's Debts
to His Creditors Pursuant 11 U.S.C. §727(a)(4) and
11 U.S.C. §727(a)(5) since Fischman's Statements on His
Official Forms That He Has Only $4,000 in Cash
Is a False Oath or Account and Since Fischman Has**

---

[4]The apartment was sold at public auction in July 2023, after bank of Jerusalem
foreclosed on it.  As noted herein, Maidenbaum collected 9 million NIS (or $2,425,950) out of
the auction proceeds in satisfaction of his New York judgments, which were  filed in Israel, after
prevailing in the Israeli fraudulent transfer action.

**Failed to Explain the Loss or Deficiency of Assets and**
**Has Failed to List Assets on the Official Form 106SUM**

100.     Paragraphs 1 - 99 are repeated and realleged as if set forth fully herein.

101.     11 U.S.C. § 727(c) provides that a creditor may object to the granting of a discharge under Bankruptcy Code section 727(a).

102.   11 U.S.C. §727(a)(4) provides that the court shall grant the debtor a discharge, unless,"the debtor knowingly and fraudulently, in or in connection with the case—(A) made a false oath or account. . . [.]"

103.   11 U.S.C. 727(a)(5) provides that the court shall grant the debtor a discharge, unless "the debtor has failed to explain satisfactorily . . . any loss of assets or deficiency of assets to meet the debtor's liabilities."

104.   Fischman's Official Form 106A/B: Property (Case No. 23-36038-cgm, ECF 16, filed 01/02/24)—includes "false oath[s] or account[s]" within the meaning of 11 U.S.C. § 727(a)(4).

105.   Fischman discloses, on his Official Form 106A/B, at Items 16, 17 and 17.1, that he has only $4,000 in cash assets. *In re Aaron Fischman*, Case No.  23-36038-CGM (Bankr., S.D.N.Y), ECF 16, pg 6 of 17.

106.   Fischman's statement that he has only $4,000 in cash is a false oath or account that was knowingly and fraudulently made.

107.    On information and belief, as of December 1, 2022, Fischman had, at minimum, $4.4 million in cash or liquid securities.  Fischman has failed to adequately explain the loss or deficiency of his assets within the meaning of 11 U.S.C. §727(a)(5).   Specifically:

(a) According to Court-filing by Fischman's own attorney, Levi Huebner, between September 7, 2007 and May 2016, Fischman received $3,861,080 in salary.

(b) For years, Fischman has ceased paying many creditors and has persuaded others to pay certain creditors for him.

(c) Fischman has persuaded other individuals and entities, including Seymour H. Marcus, Joel Landau and Aurora Equities 1, to pay his attorneys.

(d) Fischman has satisfied claims of recent creditors, including attorneys, by transferring to them portions of his interest in Ultimax Digital, Inc., which he founded. For example, the Ultimax Digital's filings with the SEC list among the current shareholders of Ultimax Levi Huebner, and Steven LaBarbera, both whom are attorneys for Fischman.

(e) Fischman has agreed to pay the New York Attorney General an additional $1 million dollars in approximately two years and has expressly and impliedly represented to the Attorney General that he is capable of doing so. However, no indication that he has $1 million in assets appears on official forms or schedules that Fischman filed on January 2, 2024 (*i.e.*, Official Forms 106Sum, 106A/B, 106C and 106E/F).

(f) Since 2007 Fischman had exclusive or nearly exclusive control over Cardis, which raised over $70 million from investors and lenders between 2007 and 2016. During that time, Cardis  paid no significant salaries to any person other than Fischman, incurred very few trade debts, routinely did not pay the trade creditors that it did have and often had its attorneys paid by third-parties. Fischman was in sole control of Cardis, misappropriated substantial of money belonging to Cardis to himself, and was in a position to loot nearly the entirety of the $70 million raised from investors and lenders. Fischman has not attempted to explain where

that substantial amount of money went, has not disclosed it on his bankruptcy schedules, does not disclose where it is located or why he doesn't still have it in his possession or control.

(g) Between August 11, 2021 and November 17, 2022, Fischman caused at least $1,532,500 to be transferred from money held on his behalf in an IOLA account at Cohen Labarbera & Landrigan, LLP, a law firm in Chester, New York, to himself and to his obligees, such as various attorneys that he has engaged.

(h) Between August 26, 2021 and December 21, 2022, Fischman or Fischman's designees received at least $561,125.00 from JP Morgan Chase accounts that Fischman beneficially owned and dominated and controlled but were nominally owned or controlled by Joel Landau or Landau's daughter, Suri Rosenbaum.

(i) Between July 29, 2020 and November 16, 2022, Fischman caused at least $329,200 to be transferred from Ultimax Digital, Inc., a company he actually dominates and controls, to his own account.

### Seventh Claim:

### Objection Pursuant to 11 U.S.C. §727(a)(4)
### to the Discharge of Fischman's Debts to
### His Creditors Since Fischman's Disclosures
### in the Official Bankruptcy Forms He
### Filed Include False Oaths and Accounts

108.    Paragraphs 1 - 108 are repeated and realleged as if set forth fully herein.

109.    Fischman's Official Form A/B is a materially false oath or account within the meaning of 11 U.S.C. §727(a)(4) since in it Fischman knowingly and fraudulently alleges a valuable asset, *i.e.,* a $4 million  apartment in Israel that located at No. 14, Building B3, Block 30028, Parcel 139 in

Jerusalem, that Fischman no longer owns, and did not own at the time he filed this case (or the Form A/B), since it was sold at judicial auction in July 2023, following a bank foreclosure.

110.   Fischman's Official Form A/B is a materially false oath or account within the meaning of 11 U.S.C. §727(a)(4) since in it he knowingly and fraudulently alleges that he owns employee stock options issued by Ultimax Digital, Inc. that have a value of $5 million.   The allegations is false either because the options do not actually exist or, if they do, they are worthless, as Fischman knows.

111.   On information and belief, Fischman knowingly and fraudulently omitted from his Official Form A/B cash he maintains in a Cohen, LaBarbera & Landrigan IOLA account as evidenced by (a) the at least $1,532,500 in payments  made out of that account either to Fischman or on Fischman's behalf between August 11, 2021 and November 17, 2022 and (b) the money that an individual, Sy Marcus, continues to funnel into the Cohen LaBarbera IOLA account for Fischman's benefit, up through the present.

112.   At Item 4.4 of Official Form 106E/F (Creditor Who Have Unsecured Claims), Fischman lists a $600,000 unliquidated debt to Levi Huebner & Associates ("Huebner"), his attorneys.  *In re Aaron Fischman*, Case No.  23-36038-CGM (Bankr., S.D.N.Y), ECF 16, at pg 15 of 17.

113.   The assertion of a $600,000 debt to Huebner is a "false oath or account" within the meaning of 11 U.S.C. § 727(a)(4) and Fischman made the statement fraudulently and knowingly since:

(a) Huebner has represented Fischman solely as a defendant. Therefore, his fees cannot possibly include a contingency element and must necessarily be based on time charges. The amount of Huebner's fees is based on time charges and invoices, and can be determined

precisely. Fischman's debt to Huebner is not "unliquidated," as Fischman asserts in the Form 106E/F. Under bankruptcy law, "unliquidated" means that the claim has not been determined in a specific amount.

(b) On information and belief, on April 30, 2018 and November 18, 2018, Fischman settled the then-outstanding fees owed to Huebner in exchange for 180,000 shares of Ultimax stock. Huebner not have continued to work for Fischman, as he does, if Fischman had incurred a $600,000 outstanding balance in the ensuing five years.

- and -

(c) Huebner is the *de facto* law partner of Lawrence Katz who received millions of dollars of funds provided by Cardis' investors and lenders into his IOLA account and routinely misappropriated money from Cardis. Katz was in a position, and had motive and opportunity, to cause fees that his *de facto* partner, Huebner, was owed by Cardis and Fischman, to similarly be paid out of the Cardis funds that Katz received into his IOLA accounts and which remain unaccounted for.

### Eighth Claim:

### Objection to the Discharge of All Fischman's Debts to His Creditors Pursuant to 11 U.S.C. §727(a)(3) Since Fischman Has Concealed Information from Which His Financial Condition May Be Ascertained

114. Paragraphs 1 - 114 are repeated and realleged as if set forth fully herein.

115. 11 U.S.C. §727(a)(3) provides that the court shall grant the debtor a discharge, unless "the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's

financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case."

116. Fischman has, at minimum, concealed information from which his financial condition and business transactions may be determined within the meaning of 11 U.S.C. §727(a)(3).

117. In 2016, in a supplementary proceeding, *Maidenbaum v. Fischman*, Sup. Ct., Nassau Co., Index No. 601538/2016, Maidenbaum served both a document subpoena and a deposition subpoena upon Fischman The document subpoena sought comprehensive discovery concerning Fischman's assets and financial condition, Cardis' assets and financial condition and transactions involving Fischman and/or Cardis. For six years, Fischman refused to comply with subpoena, frequently alleging some type of crisis within the law office of his attorney, Levi Huebner, Esq. as ground for his non-compliance. Several contempt orders were issued against Fischman; however, Fischman's non-compliance and excuses continued notwithstanding the contempt orders.

118. On April 25, 2023, Justice Cozzens ordered Fischman appear to appear his Courtroom for his deposition on May 9, 2023. The decision provided that, if Fischman did not appear, a warrant would issue for his arrest followed by 30 days of incarceration. Justice Cozzens' decision stated:

> It has been almost seven years since the Judgment (based upon a Confession of Judgment) was entered in this action. There has been constant avoidance of providing financial documents and failure to comply with Court Orders. Though claiming not to have funds $1,000,000 was paid to another Creditor.

It further stated:

> The underlying subpoena was served in June of 2017 almost six (6) years ago and in spite of the orders of Justice Murphy and the undersigned there has been no compliance whatsoever. There have been ten motions relating to the 2017 subpoenas including six by the Plaintiff for Contempt of Court and by the Defendant seeking to quash and/or for a protective order. The conduct on the part of the Defendants is making a mockery of this Court.

119. Justice Cozzens provided that Fischman could purge the contempt and avoid arrest and incarceration by complying with the subpoena and appearing in Court on May 9 for his deposition. However, Fischman still refused to comply with the subpoenas.[5]

120. Fischman had another opportunity to purge the contempt on December 20, 2023. However, that day, Fischman again failed to appear before Justice Cozzens for his Court-ordered deposition and document production, and Justice Cozzens issued a warrant for his arrest. Neither the Nassau County Sheriff nor the Fallsburg, New York Town Police have been able to execute he arrest warrant. Fischman's debit card statement shows that, following the arrest warrant, he relocated to New Jersey to avoid arrest and incarceration.

---

[5]Instead, Fischman apparently induced an alleged creditor, Ahron Berlin, to file collusive involuntary Chapter 11 case. That case was filed on May 8, 2023, the day before Fischman's court-ordered and in-court deposition and document production before Justice Cozzens. The case was dismissed by a decision of this Court on July 11, 2023, after Berlin failed to serve the summons or appear at the Government Zoom hearing on the Court's motion to dismiss.

Following dismissal of that "involuntary" case, Fischman's in-court deposition and document production was rescheduled by Justice Cozzens for August 14, 2023. Choshen Israel, LLC, represented Fischman's lawyer Linda Tirelli, then filed a Chapter 11 case, *In re Choshen Israel LLC*, Case No.23-35636-cgm (Bankr., S.D.N.Y.) Justice Cozzens then severed Maidenbaum's judgment enforcement claim against Fischman from the claims against Choshen and Cardis. The severance was granted at the request of Maidenbaum, who wanted to preempt Fischman's incorrect, but inevitable, arguments that the contempt proceeding was automatically stayed by the *Choshen* case. The *Choshen* case was filed at Fischman's behest, even though there were millions in dollar of judgment debts against it, and Choshen had no employees or assets, and had not had any income for years; and, accordingly, could not possibly reorganize.

On August 10, 2023, Fischman, then *pro se*, filed a Chapter 13 case, thereby automatically staying the contempt proceeding, deposition and document production before Justice Cozzens. Fischman filed this Chapter 13 case, even though his debts far surpassed the $2.75 million eligibility limit for Chapter 13 debtors. Following the dismissal of Fischman's Chapter 13 case, Justice Cozzens again ordered Fischman to appear in Court for the deposition and document production. Yet again, Fischman failed to appear, and Justice Cozzens ordered his arrest and incarceration. *See* ¶120.

121. The information sought by Maidenbaum's document in the subpoena in the supplementary proceeding was recorded information from which Fischman's financial condition or business transactions might be ascertained .

122. Fischman has knowingly and willfully concealed the information sought by Maidenbaum's document subpoena in the supplementary proceeding.

123. There are no circumstances justifying Fischman's concealment of the recorded information sought by Maidenbaum's document subpoena in the supplementary proceedings.

124. Fischman has refused to produce written copies of the Ultimax stock option contracts that he contends are worth $5 million, despite Maidenbaum's request for those contracts at his creditors meeting.

125. Fischman has refused to produce documents that Maidenbaum demanded in an Adversary Proceeding, *Weisshaus v. Stein*, *et al.*, AP No. 23-09024-cgm (Bankr., S.D.N..Y, Poughkeepsie Division), in which Maidenbaum has asserted a cross-claim against Fischman.

126. To the extent Fischman is no longer in possession of the recorded information from which is financial condition or business transactions may be ascertained that is because he "destroyed, mutilated, falsified, or failed to keep or preserve," the destruction of the the evidence also violaes 11 U.S.C. §727(a)(3).

## RESERVATION OF RIGHTS

Maidenbaum hereby reserves the right to assert any additional claims under 11 U.S.C. §523 and 11 U.S.C. §727 that are timely, warranted in light of newly discovered evidence and/or within the Court's equitable powers to allow.

**WHEREFORE,** Maidenbaum requests the following relief:

1.   On the First Claim, a declaratory judgment that the $4,314,611.07 Debt is nondischargeable pursuant to 11 U.S.C. §523(a)(2).

2.   On the Second Claim, a declaratory judgment that the $594,793.79 debt is nondischargeable pursuant to 11 U.S.C. §523(a)(2).

3.   On the Third Claim, a declaratory judgment that the $4,314,611.07 and $594,793.79 debts are nondischargeable pursuant to 11 U.S.C. §523(a)(4).

4.   On the Fourth Claim, a declaratory judgment that the $477,617.02 debt is nondischargeable pursuant to 11 U.S.C. §523(a)(2).

5.   On the Fifth Claim, a declaratory judgment that the $204,936.15 debt is nondischargeable pursuant to 11 U.S.C. §523(a)(2).and 11 U.S.C. §523(a)(6).

6. On the Sixth through Eighth Claims, a judgment pursuant to 11 U.S.C. §727 . denying Fischman a discharge of the legitimate debts he has disclosed in this bankruptcy or that are held by actual creditors with meritorious claims against him.

- and -

7. Such other relief as the Court may deem just and appropriate.

Dated: New York, New York
          March 18, 2024

Berry Law PLLC

By:    /s/Eric W. Berry
          Eric W. Berry
745 Fifth Avenue, 5th Floor
New York, New York 10151
(212) 355-0777
berrylawpllc@gmail.com

Tarter Krinsky & Drogin LLP

By:    /s/Michael Z. Brownstein
          Michael Z. Brownstein
1350 Broadway, 11th Floor
New York, New York 10018
(212) 216-8000
mbrownstein@tarterkrinsky.com

*Attorneys for Shalom Maidenbaum,*
 *a Creditor*